1    313.    The Department of Education provides material support by and through

2    federal financing of the enterprise's operations.

3    314.    The Department of Education's role in the enterprise is to manufacture

4    adherence of Defendant RFUMS's podiatry program to federal standards, in the clear and

5    present fact, RFUMS charges Dr. Abazari, and numerous others, full tuition but does not

6    provide said students the benefit of "placement services for program completers."

7    315.    As published in the "Financial Aid Information for Incoming Podiatry

8    Students," by Defendant RFUMS through their Financial Aid Office, RFUMS presents

9    the option of using Federal Stafford Loans for their education:



10

11    316.    As noted by screenshots of the article Podiatry—The Big Lie, Big Lie

12    Number 6, http://www.angelfire.com/on/podiatry, the Department of Education

13    manufactures and manages compliance with federal standards so the enterprise could

14    have access to a broader pool of available podiatry student victims, who like Dr. Abazari,

15    can only use Federal assistance to fund their podiatry education expenses:

**Big Lie Number 6**
*Financial Aid is available...*

16

151

Let me first say that if you really want to go to podiatry school and you will not have to take a loan to do it, you are very, very lucky and you should remember that. If all young doctors graduated with no loan obligations the world would be a much better and more ethical place.

I know that each school will tell you there are "scholarships" available for your podiatry education, but let's be serious. Most schools can offer only token non-loan financial aid. That means the rest comes from students, your parents, your relatives, or loans.

**Do you realize how much money these schools make off of government loans??**

Now you know why they propagandize so much. If the only people who went to school were the ones who could pay out of pocket, most of the schools would close.

Look at any school website. Most of the schools project a budget of around $34-35,000 per year. I believe that this figure is a conservative estimate because it does not take into account the money you will spend traveling to rotations, to externships, for multiple application fees, for interviews at CRIPs. That is additional THOUSANDS of dollars. Please visit the SCPM website, if you're interested, which shows a gradual increase of the costs up to $41.5K in your fourth year. My gosh, I believe I have stumbled upon something that resembles honesty!

But let's say for the sake of argument that this figure is correct, $35,000/year. **After four years, you will have a total of $140,000 for your education.** Much of that might be in loans at variable interest rates. You might do a residency, and **when you finally get into private practice making your average $35,000 a year do you really think you will be able to afford the monthly payment of somewhere around $1000?** No, you say, you'll wait until you're making the big money. Ten years down the line when you are finally making your average, and much promised, $110,000. But how much has your debt grown since you got out of school? The answer is "enormously."

Listen closely, **the schools have nothing to lose and millions of dollars to gain by convincing you to enroll in podiatry school because the burden of repayment is on you.** They like to play the sincere academicians, they put together these tear jerking mission statements about preparing you for your future, but the truth is **they don't give a hoot about your future.** They know that **their time to make money off of you is while you are in school.** If you give money after you have graduated, super, but they are not counting on that. I remember the day I interviewed at a certain northerly podiatry school. They were begging to take my nonrefundable $500 check on the spot.

Are they going to tell you how hard it is out there?? No way. Are they going to tell you that you will have loans until the day you die? No way. This is real life people.

1

2

**There are good podiatrists, who did things the "right way."
They have $150,000 or more in loans.
They are working for less than $50,000 a year.
Will they EVER be free of educational debt???**

Out of that $50,000 salary how much of that do you take home? How much do you apply to other bills? How much do you have to apply to loans each month? Your school doesn't care, but you should. For more on this topic, please see The Loan Danger Hides Again!

3

1      317.    The Department of Education fabricates RFUMS podiatry program's

2    compliance to federal standards so that the enterprise could misrepresent and masquerade

3    as the "quality of the podiatric medical education program and the continued commitment

4    of the institution to support the educational program," by admitting a podiatry program is

5        "a program that prepares individuals for the independent
6        professional practice of podiatric medicine, involving the
7        prevention, diagnosis, and treatment of diseases, disorders, and
8        injuries to the foot and lower extremities:



9

10      318.    As noted by Communication by Defendant RFUMS on Sep 13, 2013,

11    Defendant RFUMS resorts to luring students into filing out accreditation surveys for the

12    podiatry program, in exchange for a chance to win an iPAD Mini, as a result of "low

13    return rate from your class on the survey this year—so low that the data was unreliable,"

14    so that it could assist the enterprise in achieving its objective, in masquerading as the

15    "quality of the podiatric medical education program and the continued commitment of the

16    institution to support the educational program":

From: Nancy Parsley <nancy.parsley@rosalindfranklin.edu>
Date: Fri, Sep 13, 2013 at 1:38 PM
Subject: Survey Request & Raffle Prize for Completion
To: Nancy Parsley <nancy.parsley@rosalindfranklin.edu>
Cc: John Becker <john.becker@rosalindfranklin.edu>, Daniel Bareither <daniel.bareither@rosalindfranklin.edu>, Patty Cunningham
<patricia.cunningham@rosalindfranklin.edu>, Beth Jarrett <beth.jarrett@rosalindfranklin.edu>, Nancy Bryant <nancy.bryant@rosalindfranklin.edu>,
Kara Etolen <kara.etolen@rosalindfranklin.edu>

Dear Doctors and Graduates of the SCPM class of 2013,
I hope all is going well for you, and that the College has prepared you for your post-graduate activities. We need to ask a special favor of you. The
College is up for accreditation this year, and it is important that SCPM has enough data to support the curriculum. We rely a lot on the curriculum
surveys, especially those filled out by those who have gone through the entire program – namely, you, our graduates. We had a low return rate from
your class on the survey this year – so low that the data was unreliable. So we are asking you if you would fill out the survey to help your alma mater
assess the curriculum (it's only 26 questions).
As an incentive, I am offering a raffle ticket for those who return the survey, for one prize (an iPad Mini). We cannot use D2L, so we are using Survey
Monkey.
The link to the survey is: https://www.surveymonkey.com/s/J8RC5JQ
If you wish to remain anonymous, do not answer the last question with your name. If you want to enter the raffle, we will need your name to award the
prize. However, I assure you that that the only person who will know names is the Administrative Assistant handling the survey (Ms. Patty
Cunningham), and she is sworn to secrecy. Please do not be afraid to criticize the curriculum (no curriculum is perfect) and we welcome positive
feedback as well to know what is working from the students' perspective. We really do read the surveys (after Patty has removed the names), and we
do try to make practical changes that will help future students.
If you already completed the survey prior to graduation, thank you. Unfortunately, we do not have a way to transfer those responses to Survey Monkey,
so we are asking you to complete it again. This will also allow us to include you in the raffle for the iPad Mini if you provide your name.
Thanks, and please let us know about your successes in your current program.
Sincerely and with appreciation,
Dr. Parsley

--
Nancy L. Parsley, DPM, MHPE
Dean
Dr. William M. Scholl College of Podiatric Medicine
Rosalind Franklin University of Medicine and Science
3333 Green Bay Road
North Chicago, IL 60064
Office: 847-578-8401
Fax:   847-775-6516
nancy.parsley@rosalindfranklin.edu

Explore a Career in Podiatric Medicine

1

2       319.    The APMA's role in the enterprise was to serve as marketing and

3   advertising Manager by directing "efforts in the area of promotion and marketing of the

4   podiatric medical profession [that] made a significant impact on reinvigorating student

5   interest in pursuing careers in podiatric medicine."

6       320.    APMA was well aware of the issue of "enough slots for students who are

7   graduating for schools of podiatric medicine," where the APMA admits "[t]here are

8   currently enough slots for students who are graduating for schools of podiatric medicine":

**Q. Is the availability of podiatric residencies an issue?**
**A.** There are currently enough slots for students who are graduating from schools of podiatric
medicine. There are fewer applicants to the colleges, which may be reflected later on. Surpluses in
residency positions may exist in the future as fewer students attend the colleges. (See "In the News,"
p. 14).

9

10

321.   The APMA, in furtherance of an involvement in said enterprise,

"conducted an online survey" to help the enterprise exploit the market of students seeking

to become podiatrist by figuring out "[w]hat [s]tudents [w]ill [p]ay" and devised multiple

plans and strategies for exploitation of students, within its Workforce study, that would

provide structure on how the enterprise would go about effectuating the actual plan of

defrauding Podiatry students of money, charging for benefits they would not receive.

322.   The APMA and RFUMS, by and through Dean Dr. Albright, acquired the

backing of the Department of Education, by visitations with the White House:



Members of the Board of Trustees of the American Podiatric Medical Association enjoyed a private meeting with President Bill Clinton at the White House during sessions at APMA's recent annual meeting in Washington, DC. **FRONT ROW**, from left: Sheldon Willens, DPM, Hollywood, Florida, retiring president; Marc D. Lenet, DPM, Baltimore, president; Mr. Clinton; and Christian A. Robertozzi, DPM, Newton, New Jersey. **MIDDLE ROW**, from left: Robert D. Sowell, DPM, Oklahoma City; Theresa Conroy, DPM, Philadelphia, treasurer; David Schofield, DPM, Elmira, New York; and Werner Strupp, JD, Washington, DC, APMA general counsel. **BACK ROW**, from left: Richard B. Viehe, DPM, Santa Ana, California; Ronald S. Lepow, DPM, Houston, vice president; Terence B. Albright, DPM, Chicago, president elect; H. F. Brown, III, DPM, Little Rock, Arkansas, past president; J. D. Ferritto, Jr., DPM, Grove City, Ohio; Lloyd S. Smith, DPM, Newton Center, Massachusetts; and Harold B. Glickman, DPM, Washington, DC.

323.   Navient's role in the enterprise was perform accounting that directed and

maintained a continued revenue of federal funding to the unlawful and criminal acquired

loans, by enforcing said loans against students, despite the enterprise's podiatry program

being in non-compliance with mandates set forth or in accordance with 20 USC

§1094(a)(1); 20 USC §1094(a)(17); 18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20

USC §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant

1   to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7);

2   20 USC §1094(a)(21); 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

3       324.   As the accountant of the enterprise, Navient was, and is, forcing Dr.

4   Abazari into a duty to perform "service[e his] student loan debt" through means of none

5   "place[ment] in a CPME approved residency program," by compelling him to make

6   payment—in threating him with accruing, ballooning his debt obligations—in the clear

7   and present fact, Dr. Abazari was denied the "capab[ility] of servicing [his] student loan

8   debt" by receiving the federal benefits and services of "placement services for program

9   completers," and preparation for "independent professional practice of podiatric

10  medicine," despite statutory mandates and specification within 20 USC §1094(a)(1); 20

11  USC §1094(a)(17); 18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC

12  §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20

13  USC §1094(a)(7); 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20

14  USC §1094(a)(21); 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

15      325.   As managing accountant, Naivient usurped control of Dr. Abazari's

16  student debt and finances, disallowing Dr. Abazari from minimizing his risk of loss

17  through loan discharge, and restricting access to financial records, ensuring continued

18  payment for services not rendered, accruing Dr. Abazari's loan debt to $272, 834.09,

19  approximately $110,174.09 above and beyond the average debt of 162,660 represented to

20  "Incoming Podiatry Students" by Defendant RFUMS "Financial Aid Office":



1

2      326.    RFUMS role in the enterprise was to provide facilities for the "podiatric

3   medical education program and the continued commitment of the institution to support

4   the educational program," to lure students into paying large sums of money for services,

5   that they would not receive, as outlined by 20 USC §1094(a)(1); 20 USC §1094(a)(17);

6   18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC §1092(a)(1)(M), pursuant to 20

7   USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20 USC §1094(a)(7); 20 USC

8   §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20 USC §1094(a)(21); 20 USC

9   §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

10     327.    The enterprise conducts its affairs through a pattern of predicate acts as a

11  violation of or attempted violation of 18 U.S.C. §1341 performed by DOE; violation of or

12  attempted violation of 18 U.S.C. §1341 performed by the State of Illinois; violation of 18

13  USC 1581(A) performed by Navient; violation of or attempted violation of 18 USC

14  1581(B) performed by Navient; violation of or attempted violation of 18 USC §1584(A)

15  performed by DOE; violation of or attempted violation of 18 U.S.C. §1584(A) performed

16  by the State of Illinois; violation of or attempted violation of 18 U.S.C. §1341 performed

17  by RFUMS; violation of or attempted violation of 18 U.S.C. §1341 performed by

18  RFUMS; violation of or attempted violation of 18 U.S.C. §1341 performed by APMA.

1    328.    The predicate acts all involve: the same victim Dr. Abazari; a participating

2    manager of the enterprise; and same injury—the acquisition and billing for loans of $272,

3    834.09 for benefits or services not rendered.

4    329.    The predicate acts all have the same scheme to induce students into debt,

5    and keeping them in debt, by selling and charging for benefits and services not render to

6    them, as set forth or in accordance with 20 USC §1094(a)(1); 20 USC §1094(a)(17); 18

7    U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC §1092(a)(1)(M), pursuant to 20

8    USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20 USC §1094(a)(7); 20 USC

9    §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20 USC §1094(a)(21); 20 USC

10   §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

11   330.    The enterprise's activities directly affect interstate commerce by draining

12   the National Treasury of funds and contributing to a national student loan debt.

13   331.    As noted by a screen shot of the report by the Board of Governors of the

14   Federal Reserve System, student loans debt has a direct effect on the national economy:



15

16   332.    Were it not for the predicate acts as a violation of or attempted violation of

17   18 U.S.C. §1341 performed by DOE, within said enterprise, Dr. Abazari would not

18   acquired federal loans of $272, 834.09, which still continue to accumulate interest, for

19   benefits and services not rendered.

1    333.    Were it not for the predicate acts as a violation of or attempted violation of

2    18 U.S.C. §1341 performed by the State of Illinois, within said enterprise, Dr. Abazari

3    would not acquired federal loans of $272, 834.09, which still continue to accumulate

4    interest, for benefits and services not rendered.

5    334.    Were it not for the predicate acts as a violation of 18 USC 1581(A)

6    performed by Navient, within said enterprise, Dr. Abazari would not acquired federal

7    loans of $272, 834.09, which still continue to accumulate interest, for benefits and

8    services not rendered.

9    335.    Were it not for the predicate acts as a violation of or attempted violation of

10   18 USC 1581(B) performed by Navient, within said enterprise, Dr. Abazari would not

11   acquired federal loans of $272, 834.09, which still continue to accumulate interest, for

12   benefits and services not rendered.

13   336.    Were it not for the predicate acts as a violation of or attempted violation of

14   18 USC §1584(A) performed by DOE, within said enterprise, Dr. Abazari would not

15   acquired federal loans of $272, 834.09, which still continue to accumulate interest, for

16   benefits and services not rendered, as set forth or in accordance with 20 USC

17   §1094(a)(1); 20 USC §1094(a)(17); 18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20

18   USC §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant

19   to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7);

20   20 USC §1094(a)(21); 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

21   337.    Were it not for the predicate acts as a violation of or attempted violation of

22   18 U.S.C. §1584(A) performed by the State of Illinois, within the enterprise "Scholl

23   College of Podiatric Medicine," Dr. Abazari would not be had loans of $272, 834.09, and

1    still accumulating, for a benefit or service of placement into residency not rendered,

2    despite statutory mandates pursuant to 20 USC §1094(a)(1); 20 USC §1094(a)(17); 18

3    U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC §1092(a)(1)(M), pursuant to 20

4    USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20 USC §1094(a)(7); 20 USC

5    §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20 USC §1094(a)(21); 20 USC

6    §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

7          338.   Were it not for the predicate acts as violations of or attempted violations

8    of 18 U.S.C. §1341 performed by RFUMS, within said enterprise, Dr. Abazari would not

9    acquired federal loans of $272, 834.09, which still continue to accumulate interest, for

10    benefits and services not rendered, despite statutory mandates pursuant to 20 USC

11    §1094(a)(1); 20 USC §1094(a)(17); 18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20

12    USC §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant

13    to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7);

14    20 USC §1094(a)(21); 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

15          339.   Were it not for the predicate acts as a violation of or attempted violation of

16    18 U.S.C. §1341 performed by APMA, within said enterprise, Dr. Abazari would not

17    acquired federal loans of $272, 834.09, which still continue to accumulate interest, for

18    benefits and services not rendered, despite statutory mandates pursuant to 20 USC

19    §1094(a)(1); 20 USC §1094(a)(17); 18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20

20    USC §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant

21    to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7);

22    20 USC §1094(a)(21); 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

1      340.  In every possible manner herein alleged, the APMA, RFUMS, DOE,

2  Navient, and State of Illinois sought to capitalize on Dr. Abazari's weakened physical

3  condition, in calculated and coordinated attacks, to increase physiological harm, and to

4  overpower Dr. Abazari objections, using force and inducing emotional submission—

5  through a psychological state of learned helplessness:

 

6

7  (Left—On or around February 7, 2016)   (Right—On or around November 14-2010)

8  **CAUSE OF ACTION 11:**

9  **(CONSPIRACY TO COMMIT VIOLATION OF 18 USC §1962(c)—18 U.S.C.**

10  **§1962(d) and 42 U.S.C. §1985(3))**

11      341.  Dr. Abazari repeats and realleges each and every allegation contained in

12  paragraphs 1 through 340 as if fully set forth herein.

13      342.  Navient, RFUMS, and APMA are herein alleged to be three separate and

14  distinct entities.

15      343.  DOE and State of Illinois are herein alleged to be two separate and distinct

16  government entities.

17      344.  Navient, RFUMS, APMA, DOE, and State of Illinois entered into a

18  conspiracy to commit a violation of 18 USC §1962(c).

19      345.  Navient, Department of Education, State of Illinois, RFUMS, and APMA

20  formed an unlawful agreement to conduct the affairs of a union, group, association and

1    joint venture—for the purpose of charging for benefits and services it doesn't provide—

2    through a pattern of racketeering activity: a violation of or attempted violation of 18

3    U.S.C. §1341 performed by DOE; a violation of or attempted violation of 18 U.S.C.

4    §1341 performed by the State of Illinois; a violation of or attempted 18 U.S.C. §1581(A)

5    performed by Navient; a violation of or attempted violation of 18 U.S.C. §1581(B)

6    performed by Navient; a violation of or attempted violation of 18 U.S.C. §1584(A)

7    performed by DOE; a violation of or attempted violation of 18 U.S.C. §1584(A)

8    performed by the State of Illinois; a violation of attempted violation of 18 U.S.C. §1341

9    performed by RFUMS; a violation of or attempted violation of 18 U.S.C. §1341

10   performed by RFUMS; a violation of or attempted violation of 18 U.S.C. §1341

11   performed by APMA.

12        346.    The violation of or attempted violation of 18 U.S.C. §1341 performed by

13   DOE, the violation of or attempted violation of 18 U.S.C. §1341 performed by the State

14   of Illinois, the violation of or attempted violation 18 U.S.C. §1581(A) performed by

15   Navient, the violation of or attempted violation of 18 U.S.C. §1581(B) performed by

16   Navient, the violation of or attempted violation of 18 U.S.C. §1584(A) performed by

17   DOE, the violation of or attempted violation of 18 U.S.C. §1584(A) performed by the

18   State of Illinois, the violation of or attempted violation of 18 U.S.C. §1341 performed by

19   RFUMS, the violation of or attempted violation of 18 U.S.C. §1341 performed by

20   RFUMS, the violation of or attempted violation of 18 U.S.C. §1341 performed by

21   APMA, each were in furtherance of a union, group, association and joint venture

22   operating for the common purpose of to charge for benefits and services that would not

23   be rendered.

1      347.   Navient, Department of Education, State of Illinois, RFUMS, APMA,

2   operated the enterprise —to charge for benefits and services it doesn't provide—as a

3   manager managed liability Corporation (LLC).

4      348.   Navient, Department of Education, State of Illinois, RFUMS, APMA,

5   divided the work in the operation of the enterprise —to charge for benefits and services it

6   doesn't provide—where the State of Illinois serves as manager and State compliance

7   officer; Department of Education serves as manager and Federal compliance officer, and

8   Financer; APMA serves as manager of department of marketing and planning; Navient is

9   manager of billing and accounting; and RFUMS is manager of facility operations.

10     349.   Without any one link in the enterprise —to charge for benefits and

11   services it doesn't provide—performed by Navient, Department of Education, State of

12   Illinois, RFUMS, APMA, in divided operations, the enterprise could not function to

13   direct and reach its purpose, beyond the State of Illinois's borders, across five States, into

14   the State of California, to victimize Dr. Abazari, as a resident of the State of California:

> From: "Meinhardt, Mandy" <Mandy.Meinhardt@rosalindfranklin.edu>
> To: Armin Abazari <arminabazari@yahoo.com>
> Cc: "Young, Kimberly J." <Kimberly.Young@rosalindfranklin.edu>
> Sent: Monday, November 24, 2008 8:16 AM
> Subject: RE: Armin Abazari-Scholl inquiry ( Hello Mandy)
>
> Hi Armin,
>
> I am happy to extend your due date for Scholl College. If your interview at CSPM is on 12-5, why don't you let me know by the end of the following week - December 12, 2008. If you have any questions between now and then, please let me know.
>
> As for your scholarship, all decisions made by the Scholarship Committee are final. We believe Scholl College offers the best educational experience available to podiatry students and provide outstanding services to help you manage your debt after graduation. Last year, Scholl College had a 0% default rate for student loans and our 10-year average is 0.3%. This is well below the national average of approximately 4-5% for medical school students. Scholl offers the largest scholarship program of all podiatric medical colleges. Last year we awarded in excess of $600,000 for students in their 2nd,3rd and 4th years of study with us.
>
> Please let me know if you have any other questions!
> Best,
> Mandy

15

16     350.   Without any one link in the enterprise —to charge for benefits and

17   services it doesn't provide—performed by Navient, Department of Education, State of

18   Illinois, RFUMS, APMA, in divided operations, the enterprise could not function to

1   direct and reach its purpose, beyond the State of Illinois's borders, across five States, into

2   the State of California, to victimize Dr. Abazari, as a resident of the State of California:

**Armin Abazari-Monday Interview Barry University**        arminabazari@ya.../Sent

 **Armin Abazari** <arminabazari@yahoo.com>        Nov 29, 2008 at 9:34 PM
To: Rodriguez, Amy E <AERodriguez@mail.barry.edu>

Good Evening  Mr. Marc Weiner,

I appreciate the interview invite that Barry has offered me. I recieved acceptances from both Chicago and Phelidelphia Pod schools but I was still very intersted in visiting Barry's School of Podiatric Medicine and Surgery. Unfortunately however I cannot afford to travel outside of California at this time due to financial bindings. I am certain that Barry provides a quality education for its students and I am sadened that I cannot make the trip. I appreciate your time and consideration.

Best,
3   Armin Abazari

4        351.    The enterprise has entered into operations on or around 2000 and remains

5   currently in operation.

6        352.    The enterprise has and continues to charge and acquire benefits and profits

7   from Dr. Abazari's acquisition of compounding and accruing interest.

8        353.    The APMA and RFUMS formed an unlawful agreement to conduct the

9   affairs of a union, group, association and joint venture that operated for the common

10   purpose of selling and charging for benefits and services it does not rendered, in agreeing

11   to form a "game plan to beef of enrollment numbers":

> In fact, as this issue went to press, the American Podiatric Medical Association (APMA) was set to hold a weekend of meetings at the end of October with representatives from the seven colleges, students and health care advisors from colleges around the country. The goal of the meetings was to come up with a game plan to beef up the enrollment numbers, according to
12   Christian Robertozzi, DPM, chairman of the recruitment subcommittee for the APMA.

13        354.    APMA acted, during the unlawful agreement and in furtherance of the

14   unlawful agreement, to conduct the affairs of a union, group, association and joint

15   venture for the common purpose of selling and charging for benefits and services not

16   rendered, by "conduct[ing] an online survey," to figure out "[w]hat [s]tudents [w]ill

17   [p]ay," to "help the colleges recruit more students":

**What Students Will Pay**

The American Podiatric Medical Association recently conducted an online survey to learn about how and when podiatric physicians choose to go into the field. The results will be used by the Recruitment Subcommittee of the Education Committee of the APMA to help in developing a plan to help the colleges recruit more students.

1

2      355.    As noted by communication screenshot by the American Podiatric

3   Medical Student Association (APMSA), APMA and RFUMS acted, during the unlawful

4   agreement and in furtherance of the unlawful agreement, to conduct the affairs of a union,

5   group, association and joint venture for the common purpose of selling and charging for

6   benefits and services not rendered, by creating an "Ad Hoc Committee" because they

7   knowingly and willingly created a shortage of "enough entry-level graduate positions for

8   each graduating positions for each graduating podiatric medical student":

9

From: "APMSA" <apmsa@students.rosalindfranklin.edu>
Date: September 28, 2010 at 10:33:58 AM PDT
To: "SCPM2012" <SCPM2012@rosalindfranklin.edu>, "SCPM2013" <SCPM2013@rosalindfranklin.edu>
Subject: * Survery on Podiatric Residency Development *

SCPM 2012 and 2013:

In 2004 the AACPM created an Ad Hoc Committee on Balance Graduates and Residency Positions (Balance Committee) to analyze and recommend strategies to ensure there are enough entry-level graduate positions for each graduating podiatric medical student.  This committee is comprised of representatives from AACPM Deans, AACPM/COTH, APMA, APMSA, CPME, APMA-Young members, ABPS, ABPOPPM, ASPS, ACFAS and ACFAOM.  The committee recently expanded its charge to include "the establishment of a comprehensive strategy for a cohesive approach to residency development."

To put this charge into action the AACPM has scheduled a meeting on October 1st.  Representatives from the previously mentioned organizations have been invited to get together and discuss how to meet the new charge, while at the same time seeking to meet the AACPM/COTH goal of maintaining 110% entry level positions to graduates each year.

In preparation for this meeting, the Scholl delegation would appreciate your response to the following survery on residency development by Sept. 30:

http://www.surveymonkey.com/s/986VSYZ

We appreciate your time.

APMSA

10

1    356.    As noted by communication screenshot by the American Podiatric

2    Medical Student Association (APMSA), APMA and RFUMS acted, during the unlawful

3    agreement and in furtherance of the unlawful agreement, to conduct the affairs of a union,

4    group, association and joint venture for the common purpose of selling and charging for

5    benefits and services not rendered, by creating the "Ad Hoc Committee" in 2004 because

6    they knowingly and willingly created an "expected shortfall" in "number of available

7    residency positions":

**AACPM ad hoc Committee on the Balance between Graduates and Residency Positions**
**"Balance Committee"**

In August 2004, The American Association of Colleges of Podiatric Medicine (AACPM) Board of Directors established an ad hoc Committee of the Board to assess the correlation between the number of podiatric school graduates and the number of qualified podiatric residency positions. The charge to the Committee is to "collect data, analyze class size and enrollments and approved residency positions for the purposes of recommending strategies to ensure that there are enough entry-level residency positions for each graduating podiatric medical student."

In July 2010, the Committee's charge was expanded to include the establishment of a comprehensive strategy for a cohesive approach to residency development.  AACPM began seeking a National Residency Development Facilitator dedicated to establishing sufficient residency positions for graduates of the Colleges of Podiatric Medicine.  In June 2011, Edwin Wolf, DPM was hired to spearhead this project and remains focused on, but not limited to:

- Erasing the expected shortfall and raise the number of available residency positions to 110% of the graduating class numbers
- Opening up new sites within hospitals with established residency programs other than podiatry and/or in health science centers
- developing a core of mentors able to provide insight and perspective on the process of development and added value of a podiatric residency to hospital administrators.

There are a tremendous amount of resources and support for anyone who may be interested in starting a residency, improving their current residency program, or simply wanting to help with this initiative.  Please reach out to the following contacts:

National Residency Facilitator:  Edwin Wolf, DPM, at ewolf@aacpm.org or call (212) 874-0609.

Colleges of Podiatric Medicine:
http://www.aacpm.org\pdf\Institutional_Residency_Development_Contacts.pdf

CPME:
http://www.cpme.org/residencies/content.cfm?ItemNumber=2424&&navItemNumber=2244

APMA:  http://www.apma.org/education/content.cfm?ItemNumber=1357&navItemNumber=560

8

9    357.    APMA in conjunction with RFUMS, directly contacted Dr. Abazari and

10   other students via surveys, to collect and gather information for the Residency Balance

1    Committee because of an "expected shortfall" in "number of available residency

2    positions" that was created by the APMA and RFUMS:

**APMSA**                                                      September 30, 2010  12:03 PM
To: SCPM2012,  SCPM2013
* Reminder: Residency Survey Responses Needed *                Inbox - Google

SCPM 2012 and 2013:

For those that have not done so already, please complete the following survey today. We would like at least 20 more responses before sending our results to the Residency Balance Committee.

http://www.surveymonkey.com/s/986VSYZ

APMSA

3

4          358.    In the clear and present fact of an "expected shortfall" in "number of

5    available residency positions," RFUMS acted, during the unlawful agreement and in

6    furtherance of the unlawful agreement, to conduct the affairs of a union, group,

7    association and joint venture for the common purpose of selling and charging for benefits

8    and services not rendered, where it actually engaged in a "game plan to beef of

9    enrollment numbers" through rapidly increasing Total Fall Podiatry Enrollment:

| Time of Enrollment | Total RFUMS Fall Podiatry Enrollment |
|---|---|
| 2001 | 248 |
| 2002 | 264 |
| 2003 | 263 |
| 2004 | 298 |
| 2005 | 305 |
| 2006 | 328 |
| 2007 | 356 |
| 2008 | 359 |

| 2009 | 380 |
|------|-----|
| 2010 | 387 |

1

2      359.    In the clear and present fact of an "expected shortfall" in "number of

3 available residency positions," RFUMS acted, during the unlawful agreement and in

4 furtherance of the unlawful agreement, to conduct the affairs of a union, group,

5 association and joint venture called "Scholl College of Podiatric Medicine" operating for

6 the common purpose of selling and charging for benefits and services not rendered,

7 where it actually engaged in a "game plan to beef of enrollment numbers" through

8 achieving record enrollment for Dr. Abazari enrollment period in 2009 for the podiatry

9 program:



10

11      360.    In the clear and present fact of an "expected shortfall" in "number of

12 available residency positions," RFUMS acted, during the unlawful agreement and in

1    furtherance of the unlawful agreement, to conduct the affairs of a union, group,

2    association and joint venture called "Scholl College of Podiatric Medicine" operating for

3    the common purpose of selling and charging for benefits and services not rendered,

4    where it actually engaged in a "game plan to beef of enrollment numbers," where the

5    podiatry colleges collectivity enrolled 687 students in 2009, when only 496 residency

6    positions were available or in existence.

7    361.    The APMA in conjunction with RFUMS, created adopted a new residency

8    system which required "fewer case number requirements in the new model, as opposed to

9    the old model," to generate more substandard residency positions to hide the number of

10   graduates left unplaced by the rigged shortage of residencies:

> **Beth Jarrett**                                                    September 24, 2012  8:35 AM
> To:  d-scpm2014@rosalindfranklin.edu,   d-scpm2013@rosalindfranklin.edu              Details
> **PMS vs PMSR programs**
>
> Hello all-
> I am still getting some questions about the residency types.  Remember that the "PMS" model (PMS24 or PMS36) is the old model.  The
> PMSR (PMSR or PMSR/RRA) is the new model.  All programs will have converted to the new model by July 1, 2013.  Most PMS24 programs
> will convert to PMSR programs.  Nearly all PMS36 programs will convert to the PMSR/RRA (or PMSR with CERT) programs.  The only
> difference between a PMS 36 and a PMSR with RRA is a change in the medicine and biomechanics requirements, as well as slightly **fewer**
> case number requirements in the new model as opposed to the old model.
> Let me know if you have any questions.
> Dr. Jarrett

11

12   362.    RFUMS acted, during the unlawful agreement and in furtherance of the

13   unlawful agreement, to conduct the affairs of a union, group, association and joint

14   venture for the common purpose of selling and charging for benefits and services not

15   rendered, by violations of or attempted violations of 18 U.S.C. §1341.

16   363.    APMA acted, during the unlawful agreement and in furtherance of the

17   unlawful agreement, to conduct the affairs of a union, group, association and joint

18   venture for the common purpose of selling and charging for benefits and services not

19   rendered, by a violation of or attempted violation of 18 U.S.C. §1341.

1    364.    DOE acted, during the unlawful agreement and in furtherance of the

2    unlawful agreement, to conduct the affairs of a union, group, association and joint

3    venture for the common purpose of selling and charging for benefits and services not

4    rendered, by a violation of or attempted violation of 18 U.S.C. §1341 performed by DOE.

5    365.    State of Illinois acted, during the unlawful agreement and in furtherance of

6    the unlawful agreement, to conduct the affairs of a union, group, association and joint

7    venture operating for the common purpose of selling and charging for benefits and

8    services not rendered, by a violation of or attempted violation of 18 U.S.C. §1341.

9    366.    Navient acted, during the unlawful agreement and in furtherance of the

10   unlawful agreement, to conduct the affairs of a union, group, association and joint

11   venture operating for the common purpose of selling and charging for benefits and

12   services not rendered, by a violation of or attempted 18 U.S.C. §1581(A).

13   367.    Navient acted, during the unlawful agreement and in furtherance of the

14   unlawful agreement, to conduct the affairs of a union, group, association and joint

15   venture operating for the common purpose of selling and charging for benefits and

16   services not rendered, by a violation of or attempted violation of 18 U.S.C. §1581(B).

17   368.    DOE acted, during the unlawful agreement and in furtherance of the

18   unlawful agreement, to conduct the affairs of a union, group, association and joint

19   venture operating for the common purpose of selling and charging for benefits and

20   services not rendered, by a violation of or attempted violation of 18 U.S.C. §1584(A)

21   performed by DOE.

22   369.    State of Illinois acted, during the unlawful agreement and in furtherance of

23   the unlawful agreement, to conduct the affairs of a union, group, association and joint

170

1    venture operating for the common purpose of selling and charging for benefits and

2    services not rendered, by a violation of or attempted violation of 18 U.S.C. §1584(A).

3        370.    In the clear and present fact of an "expected shortfall" in "number of

4    available residency positions," DOE joined the unlawful agreement to conduct the affairs

5    of a union, group, association and joint venture operating for the common purpose of

6    selling and charging for benefits and services not rendered, by engaging in the "game

7    plan to beef of enrollment numbers," where it agreed to provide funding for Financial the

8    enterprise, despite numerous violations of mandates set forth under 20 USC §1094(a)(1);

9    20 USC §1094(a)(17); 18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC

10   §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20

11   USC §1094(a)(7); 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20

12   USC §1094(a)(21); 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7):



13

14       371.    In the clear and present fact of an "expected shortfall" in "number of

15   available residency positions," DOE joined the unlawful agreement to conduct the affairs

16   of a union, group, association and joint venture operating for the common purpose of

17   selling and charging for benefits and services not rendered, by engaging in the "game

18   plan to beef of enrollment numbers ," where the knew the enterprise had to produce a

1      "a program that prepares individuals for the independent
2      professional practice of podiatric medicine, involving the
3      prevention, diagnosis, and treatment of diseases, disorders, and
4      injuries to the foot and lower extremities,"
5

6  but did not provide said program; and yet, the DOE still continued to fund the enterprise

7  despite this breach of 20 USC §1094(a)(1); 20 USC §1094(a)(17); 18 U.S.C.

8  §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC §1092(a)(1)(M), pursuant to 20 USC

9  §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20 USC §1094(a)(7); 20 USC

10  §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20 USC §1094(a)(21); 20 USC

11  §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

12      372.   In the clear and present fact of an "expected shortfall" in "number of

13  available residency positions," Navient joined the unlawful agreement to conduct the

14  affairs of a union, group, association and joint venture operating for the common purpose

15  of selling and charging for benefits and services not rendered, by engaging in the "game

16  plan to beef of enrollment numbers," through servicing and continuing to service the

17  federal loans rather than discharging them.

18      373.   In the clear and present fact of an "expected shortfall" in "number of

19  available residency positions," DOE and Navient acted, during the unlawful agreement

20  and in furtherance of the unlawful agreement, to conduct the affairs of a union, group,

21  association and joint venture operating for the common purpose of selling and charging

22  for benefits and services not rendered, by engaging in the "game plan to beef of

23  enrollment numbers," where they continued to service and charge interests on "federal

24  loans," while avoiding a discharge of them, despite breaches of 20 USC §1094(a)(1); 20

25  USC §1094(a)(17); 18 U.S.C. §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC

26  §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20

1    USC §1094(a)(7); 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20

2    USC §1094(a)(21); 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7):

3    Principal Balance 152,289.08 July 5, 2015; Outstanding Interest $16,160.71
4    Principal Balance 225,139.23 June 2, 2016; Unpaid Interest $2,540.93
5    Principal Balance 225,139.23 June 2, 2017; Unpaid Interest $17,524.86
6    Principal Balance 225,139.23 June 2, 2018; Unpaid Interest $32,554.30
7    Principal Balance 225,139.23 June 2, 2019; Unpaid Interest $47,694.86.
8
9        374.    In the clear and present fact of an "expected shortfall" in "number of

10   available residency positions," DOE and Navient acted, during the unlawful agreement

11   and in furtherance of the unlawful agreement, to conduct the affairs of a union, group,

12   association and joint venture operating for the common purpose of selling and charging

13   for benefits and services not rendered, by engaging in the "game plan to beef of

14   enrollment numbers," where they forced Dr. Abazari to incur a current loan debt of

15   $272,834.09—an amount $110,174.09 above and beyond the average debt of 162,660

16   represented to "Incoming Podiatry Students" by Defendant RFUMS "Financial Aid

17   Office" for their Podiatry program for Dr. Abazari upon entering—despite mandates set

18   forth or in accordance with 20 USC §1094(a)(1); 20 USC §1094(a)(17); 18 U.S.C.

19   §245(b)(1)(E); 20 U.S.C. §1087e (h); 20 USC §1092(a)(1)(M), pursuant to 20 USC

20   §1094(a)(7); 20 USC §1092(a)(1)(J), pursuant to 20 USC §1094(a)(7); 20 USC

21   §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7); 20 USC §1094(a)(21); 20 USC

22   §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7):



23

1    375.   State of Illinois joined the unlawful agreement to conduct the affairs of a

2    union, group, association and joint venture for the common purpose of selling and

3    charging for benefits and services not rendered, by forming a "game plan to beef of

4    enrollment numbers," where they authorized RFUMS in 2003 to grant the Doctor of

5    Podiatric Medicine (DPM) Degree:

Item #14
December 9, 2003

### NEW OPERATING AND/OR DEGREE-GRANTING AUTHORITY
### FOR INDEPENDENT INSTITUTIONS

| | |
|---|---|
| **Submitted for:** | Action. |
| **Summary:** | The Illinois Board of Higher Education has responsibility for administration of "The Private College Act" (110 ILCS 1005) and "The Academic Degree Act" (110 ILCS 1010). Under these statutes, new independent institutions, institutions planning to operate at a new location including a new off-campus site, and out-of-state institutions planning to operate in Illinois for the first time are required to obtain authorization to operate. These institutions are also required to obtain authorization for each new degree program. |
| **Action Requested:** | That the Board of Higher Education approves recommendations to grant operating and/or degree-granting authority to the following institutions: |

Finch University/The Chicago Medical School through the Dr. William M. Scholl College of Podiatric Medicine:
- Doctor of Podiatric Medicine (DPM)
- Bachelor of Science in Biological Sciences

Illinois Institute of Art – Schaumburg
- A.A.S. in Culinary Arts
- B.A.S. in Culinary Management

Northwestern Business College – Chicago
- A.A.S. in Health Information Technology in West Suburban Region
- A.A.S. in Medical Assisting in West Suburban Region

Robert Morris College
- A.A.S. in Fitness Specialist in South Metropolitan and West Suburban Regions

University of St. Francis
- Master of Science in Teaching and Learning in Chicago Region

6                                    85

7    376.   State of Illinoi acted, during the unlawful agreement and in furtherance of

8    the unlawful agreement, to conduct the affairs of a union, group, association and joint

9    venture operating for the common purpose of selling and charging for benefits and

services not rendered, by engaging in the "game plan to beef of enrollment numbers," where they make false statements to the public

> "After graduation Scholl College places its graduates in 24 month and 36 month residency training programs located across the United States. Upon completion of training, podiatric physicians prepare for state professional state licensure examinations as well at board certification examinations":

**FINCH UNIVERSITY/THE CHICAGO MEDICAL SCHOOL - DR. WILLIAM M. SCHOLL COLLEGE OF PODIATRIC MEDICINE**

On-Campus

- Doctorate of Podiatric Medicine
- Bachelor of Science in Biological Sciences.

The Herman M. Finch University of Health Sciences/The Chicago Medical School (FUHS/CMS) has entered into an agreement with the Dr. William M. Scholl College of Podiatric Medicine involving the transfer of assets of Scholl College to FUHS/CMS as well as the physical move of Scholl College from facilities at 1001 N. Dearborn St., Chicago, Illinois to FUHS/CMS's campus located in North Chicago. The acquisition of Scholl College's assets and the facilities relocation to North Chicago with FUHS/CMS places Scholl College as the fourth college within the FUHS/CMS system.

Finch University, through the newly acquired Scholl College, will request degree authorization to grant the Doctor of Podiatric Medicine (D.P.M.) and the Bachelor of Science (B.S.) in Biological Science to students interested in entering the profession of podiatric medicine. The programs attract professional students ranging in age from 21 to the 40's from the majority of states and representatives from many ethnic and all racial groups. Curricula for the programs will remain the same as previously offered by Scholl College.

Students who are enrolled present evidence of strong preparation for professional studies. Each year approximately 80% of the students admitted possess a baccalaureate or advanced degree. In each case a candidate must complete 90 semester credit hours (135 quarter hours) of course work at an accredited college or university prior to enrollment. Candidates are required to complete the Medical College Admission Test (MCAT) prior to admission.

Scholl College expects to matriculate 90 students per year for a total enrollment of approximately 360 students. Students complete a curriculum comprised of basic science, clinical science and clerkship training. After graduation Scholl College places its graduates in 24 and 36 month residency training programs located throughout the United States. Upon completion of training, podiatric physicians prepare for state professional licensure examinations as well as board certification examinations. Scholl College has trained approximately one-third of the practicing podiatrists in the United States.

The D.P.M. program is accredited by the Council on Podiatric Medical Education of the American Podiatric Medical Association and approved by the United States Department of Education. FUHS/CMS is accredited by The Higher Learning Commission and is a member of the North Central Association of Colleges and Schools.

Persons interested in obtaining further information about this notice should contact: Margot Surridge, 3333 Green Bay Road, Chicago, Illinois. Tele. (847) 578-8594.

377. The APMA believed that there was a high likelihood that RFUMS and APMA were participating in an enterprise to charge for benefits and services it doesn't

1    provide, where the APMA adopts the statement that there are "enough slots for students

2    who are graduating from schools of podiatric medicine" in response to whether there is

3    an "issue" of "availability of podiatric residencies":

> **Q. Is the availability of podiatric residencies an issue?**
> **A.** There are currently enough slots for students who are graduating from schools of podiatric
> medicine. There are fewer applicants to the colleges, which may be reflected later on. Surpluses in
> residency positions may exist in the future as fewer students attend the colleges. (See "In the News,"
> p. 14).

4

5        378.    The State of Illinois believed that there was a high likelihood State of

6    Illinois and RFUMS were participating in an enterprise to charge for benefits and

7    services it doesn't provide, where Dr. Abazari placed the state on notice of its "failing to

8    provide placement into residency upon graduation (See. Notice of Intent, Doctor of

9    Podiatric Medicine Program)" in an April 7, 2016 letter:

> My name is Armin Abazari and I am a victim of Rosalind Franklin's conversion
> of United States federal loan monies for unauthorized criminal conduct under 110 ILCS
> 1010/8 in the deliberate failing to provide placement into residency upon graduation (See.
> Notice of Intent, Doctor of Podiatric Medicine Program)(See. IPEDs: Institutional
> Characteristics Part C. #8) and substantial misrepresentation (34 CFR 668.71(b)) in their
> Podiatry Program (See. Abazari v. Rosalind Frankling University of Medicine & Science,
> IL App.2d 140952 at ¶33). Mr. Abazari approaches the issue by simple question and
> answer:

10

11       379.    RFUMS and State of Illinois believed that there was a high likelihood the

12   State of Illinois and RFUMS were participating in an enterprise to charge for benefits and

13   services it doesn't provide where Dr. Abazari says "failing to provide placement into

14   residency upon graduation (See. Notice of Intent, Doctor of Podiatric Medicine

15   Program)", in the clear and present fact that the State of Illinois expressly admits:

16       "[a]fter graduation Scholl College places its graduates in 24 month
17       and 36 month residency training programs located across the
18       United States. Upon completion of training, podiatric physicians

1     prepare for state professional state licensure examinations as well
2     at board certification examinations."
3
4          380.   The "failing to provide placement into residency upon graduation (See.

5    Notice of Intent, Doctor of Podiatric Medicine Program)," where the State of Illinois,

6    admits to the public

7          "[a]fter graduation Scholl College places its graduates in 24 month
8          and 36 month residency training programs located across the
9          United States. Upon completion of training, podiatric physicians
10         prepare for state professional state licensure examinations as well
11         at board certification examinations"
12
13   constituted a red flag to the State of Illinois, DOE, Navient, APMA and RFUMS

14   regarding the legitimacy of the education transaction.

15         381.   RFUMS believed that there was a high likelihood that RFUMS was

16   participating in an enterprise to charge for benefits and services it doesn't provide, where

17   it did not place Dr. Abazari into residency in 2013, in the clear and present fact RFUMS

18   admits, through 16 of its faculty members, on at least 6 separate occasions, the express

19   statement "100% of graduates will be placed in a CPME approved residency program":

**Programmatic Outcomes**

#1   Graduates will pass the National Board of Podiatric Medical Examiners
     Part I and Part II examinations.

#2   Graduates will pass the Clinical Competency Exam

#3   100% of graduates will be placed in a CPME approved residency program.

#4   The College will graduate students that have the necessary knowledge,
     skills, and attitudes for entry into residency training.

#5   The College will graduate at least 90% of matriculated students.

20

21         382.   RFUMS and State of Illinois believed that there was a high likelihood the

22   RFUMS and State of Illinois were participating in an enterprise to charge for benefits and

23   services it doesn't provide, where RFUMS has acquired accreditation specifically for

1    "Podiatric Medicine and Surgical Residency" in addition to and separate from their

2    Doctor of Podiatric Medicine accreditation:

**ROSALIND FRANKLIN UNIVERSITY OF MEDICINE AND SCIENCE**
**ACCREDITATION SUMMARY**

| Unit | Program | Accrediting Agency | Status |
|------|---------|--------------------|--------|
| **Rosalind Franklin University of Medicine & Science** | | | |
| | Overall accreditation as degree granting institution – Bachelor to Doctorate | The Higher Learning Commission/North Central Association of Colleges and Schools (HLC/NCA) | Full |
| **Chicago Medical School** | | | |
| | Doctor of Medicine | Liaison Committee on Medical Education (LCME) | Accredited, on probation |
| | Continuing Medical Education | Accreditation Council for Continuing Medical Education (ACCME) | Full |
| **Dr. William M. Scholl College of Podiatric Medicine** | | | |
| | Doctor of Podiatric Medicine | Council on Podiatric Medical Education (CPME) | Full |
| | Continuing Podiatric Medical Education | Council on Podiatric Medical Education | Full |
| | | IFDPR–Licenses School to offer | Full |
| | Podiatric Medicine and Surgical Residency | CPME | Full |
| **School of Graduate and Postdoctoral Studies** | | | |
| | Medical Laboratory Immunology | Committee on Postdoctoral Education Programs | |
| | *Post-graduate Program | (CPEP) of the American College of Microbiology | Full |

5    383.    The "failing to provide placement into residency upon graduation (See.

6    Notice of Intent, Doctor of Podiatric Medicine Program)", where Defendant RFUMS

7    acquired accreditation specifically for "Podiatric Medicine and Surgical Residency" in

8    addition to and separate from their Doctor of Podiatric Medicine accreditation constituted

9    a red flag to the State of Illinois, RFUMS, DOE, Navient, and RFUMS regarding the

10   legitimacy of the education transaction.

11   384.    RFUMS and State of Illinois believed that there was a high likelihood the

12   State of Illinois and RFUMS were participating in an enterprise to charge for benefits and

13   services it doesn't provide, where there are replete records of the State of Illinois making

14   use of the DOE's certification of goods or services mark "CIP Code 51.2101" stating:

15       "a program that prepares individuals for the independent
16       professional practice of podiatric medicine, involving the
17       prevention, diagnosis, and treatment of diseases, disorders, and
18       injuries to the foot and lower extremities. Includes instruction in
19       the basic medical sciences, anatomy of the lower extremity,

178

1      functional orthopedics, foot biomechanics, podiatric radiology,
2      dermatology, podiatric surgery, podopediatrics, sports medicine,
3      physical diagnosis, emergency medicine and traumatology,
4      practice management, and professional standards and ethics."

5

6      385.    The "failing to provide placement into residency upon graduation (See.

7  Notice of Intent, Doctor of Podiatric Medicine Program)," despite the use of the DOE's

8  designated mark of a

9      "a program that prepares individuals for the independent
10     professional practice of podiatric medicine, involving the
11     prevention, diagnosis, and treatment of diseases, disorders, and
12     injuries to the foot and lower extremities"

13

14  constituted a red flag to the State of Illinois, DOE, Navient, RFUMS, and APMA

15  regarding the legitimacy of the education transaction.

16      386.    In the clear and present fact of allegations 1 through 385, the State of

17  Illinois takes steps to avoid the truth by stating "[t]he Illinois Board of Higher Education

18  requires a student/complainant to complete institutional procedures":



**ILLINOIS BOARD OF HIGHER EDUCATION**
1 NORTH OLD CAPITOL PLAZA, SUITE 333
SPRINGFIELD, ILLINOIS 62701-1377

Bruce Rauner
Governor

Tom Cross
Oswego
Chair

Jane Hays
Champaign
Vice Chair

Members

John Bambenek
Champaign

Jay D. Bergman
Joliet

Max Coffey
Charleston

Teresa Garate
Chicago

Kevin Huber
Libertyville

Alice Marie Jacobs
Danville

Paul L. Linger
Lincolnwood

James Palos
Chicago

Santos Rivera
Chicago

Jack Thomas
Macomb

Christine Wiseman
Palos Heights

Student Members
Tyler Sedotto
Chicago

Nosa Anderson
Chicago

Executive Director
Dr. James L. Applegate

May 24, 2016

Armin Abazari
14 National Place
Irvine, CA  92602

Dear Mr. Abazari:

The Illinois Board of Higher Education (IBHE) received copies of your letters dated April 7 and May 13, 2016 to the Honorable John B. King, Jr., Acting Secretary of Education.

The Illinois Board of Higher Education requires a student/complainant to complete institutional procedures for complaint resolution before submitting a formal complaint to IBHE.

Based on the information provided in the above mentioned letters, it appears your complaint regarding Rosalind Franklin University of Medicine and Science has been part of a litigation process.  Please note the Illinois Board of Higher Education does not oversee issues that are being handled through the court system.

If you have additional questions related to the complaint process, please contact IBHE by phone at 217-557-7359 or e-mail at complaints@ibhe.org.

Sincerely,

Nkechi Onwuameze, Ph.D.
Assistant Director, Academic Affairs
Illinois Board of Higher Education

19

1    387.    The DOE, State of Illinois, RFUMS, Navient, and APMA took steps to

2    avoid the truth, where there was public outcry of a record breaking 86 students not being

3    placed into residency:

07/03/2013

**RESPONSES /COMMENTS (RESIDENCY SHORTAGE CRISIS) - PART 1A**

**RE: Unmatched Residency Placements Currently Stand at 86**

From: Darrell Latva, DPM

Sacred Heart Hospital in Chicago closed yesterday amid a
federal probe, which included one podiatrist. I believe we
had a program there. I guess we add those residents to the
86.

4    Darrell Latva, DPM, Chicago, IL, darrell.latva@rosalindfranklin.edu

5    388.    The State of Illinois, Navient, DOE, RFUMS, and APMA collectively

6    took steps to avoid the truth where there was public outcry on October 17, 2013, by

7    RFUMS own faculty, Dr. Sev Hrywnak, and Chairman of the Commission on the

8    Economics of Graduate Education in Illinois, raising concerns over "assurance of a

9    residency program for the students":

**IL Podiatrist Selected as  Chairman of  Graduate Education Commission**

The Commission on the Economics of Graduate Education in Illinois has selected **Dr.
Sev Hrywnak** as their new Chairman to lead the organization. The Commission,
composed of medical educators and administrators of medical programs, has been
tasked with evaluating the cost of graduate education, as it relates to tuition and
loans and the return on investment in the medical career field.



Dr. Sev Hrywnak

"The schools have an obligation to the taxpayers who front the student loans, as well
as an obligation to the students who use the loans to ensure that once students
graduate, they have the financial means to repay them in a timely manner," said Dr.
Hrywnak. "Our first order of business will be to review the tuition structure of the
Scholl College of Podiatric Medicine in Illinois and ensure the tuition provides proper
clinical education in the 3rd-4th years of school, as well as assurance of a residency
program for the students."

10

11    389.    RFUMS, State of Illinois, Navient, APMA and DOE believed that there

12    was a high likelihood the RFUMS, State of Illinois, Navient, APMA and DOE are

1   participating in an enterprise to charge for benefits and services it doesn't provide where

2   the DOE publically makes false statements that RFUMS provides a

3       "a program that prepares individuals for the independent
4       professional practice of podiatric medicine, involving the
5       prevention, diagnosis, and treatment of diseases, disorders, and
6       injuries to the foot and lower extremities":



7

8         390.   The "failing to provide placement into residency upon graduation (See.

9   Notice of Intent, Doctor of Podiatric Medicine Program)", in the presence of the

10  statement of

11      "a program that prepares individuals for the independent
12      professional practice of podiatric medicine, involving the
13      prevention, diagnosis, and treatment of diseases, disorders, and
14      injuries to the foot and lower extremities"
15
16  constituted a red flag to the RFUMS, State of Illinois, APMA, Navient and DOE

17  regarding the legitimacy of the education transaction.

18        391.   RFUMS, Navient and DOE believed that there was a high likelihood the

19  Navient, DOE, and RFUMS were participating in an enterprise to charge for benefits and

1    services it doesn't provide where the DOE expressly, reiterate multiple times and in a

2    different area of the IPEDS site, that RFUMS provides "placement services for program

3    completers" for the period 2008-2014:

# National Center for Education Statistics

## IPEDS Data Center

**Rosalind Franklin University of Medicine and Science**
**UnitID**        145558
**OPEID**        00165900
**Address**      3333 Green Bay Road, North Chicago, IL, 60064-3095
**Web Address**  www.rosalindfranklin.edu/

| IC Header 2013-14 |
| --- |

Institution: Rosalind Franklin University of Medicine and Science (145558)
inovas1

**Part A - Educational Offerings**
**1. Which of the following types of instruction/programs are offered by your institution? [Check one or more]**

*If your institution does not offer occupational, academic or continuing professional programs, you are not expected to complete this or any other IPEDS survey.*

☐  Occupational, may lead to a certificate, degree, or other formal award

☑  Academic, leading to a certificate, degree, or diploma

☑  Continuing professional (postbaccalaureate only)

☐  Recreational or avocational (leisure) programs

☐  Adult basic or remedial instruction or high school equivalency

☐  Secondary (high school)

Institution: Rosalind Franklin University of Medicine and Science (145558)
inovas1

4

**Part C - Student Services - Distance Opportunities**
**4. Which of the following selected student services are offered by your institution? [Check all that apply]**

☐  Remedial services

☑  Academic/career counseling services

☐  Employment services for current students

☑  Placement services for program completers

☐  On-campus day care for children of students

☐  None of the above

5

6

182

Institution: Rosalind Franklin University of Medicine and Science (145558)                                                      inovasi
Summary

**Institutional Characteristics Component Summary**
**Academic Year Reporters**

IPEDS collects important information regarding your institution. All data reported in IPEDS survey components become available
in the IPEDS Data Center and appear as aggregated data in various Department of Education reports. Additionally, some of the
reported data appears specifically for your institution through the College Navigator website and is included in your institution's
Data Feedback Report (DFR). The purpose of this summary is to provide you an opportunity to view some of the data that,
when accepted through the IPEDS quality control process, will appear on the College Navigator website and/or your DFR.
College Navigator is updated approximately three months after the data collection period closes and Data Feedback Reports will
be available through the Data Center and sent to your institution's CEO in November 2014.

Please review your data for accuracy. If you have questions about the data displayed below after reviewing the data reported on
the survey screens, please contact the IPEDS Help Desk at: 1-877-225-2568 or ipedshelp@rti.org.

| GENERAL INFORMATION | |
|---|---|
| Mission Statement | http://www.rosalindfranklin.edu/President/MissionVision.aspx |
| Are all the programs at your institution offered completely via distance education? | No |
| Special Learning Opportunities | N/A |
| Student Services | Academic/career counseling services<br>Placement services for program completers |
| Credit Accepted | N/A |

| PRICING INFORMATION | | |
|---|---|---|
| Average graduate student tuition and fees for academic year 2013-14 | Tuition | Fees |
| | $25,735 | $330 |
| Alternative tuition plans | N/A | |

392.     The "failing to provide placement into residency upon graduation (See.

Notice of Intent, Doctor of Podiatric Medicine Program)", in the presence of the record of

a "placement services for program completers" for the period 2008-2014, constituted a

red flag to the DOE, Navient, APMA, State of Illinois and RFUMS regarding the

legitimacy of the education transaction.

393.     Dr. Abazari's right or privilege to a benefit, within a program or activity

receiving federal financial assistance, by the "placement services for program

completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

20 USC §1094(a)(17).

394.     Dr. Abazari's right or privilege to a benefit, within a program or activity

receiving federal financial assistance, by the "placement services for program

1 completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

2 20 USC §1092(a)(1)(R), pursuant to 20 USC §1094(a)(7).

3       395.    Dr. Abazari's right or privilege to a benefit, within a program or activity

4 receiving federal financial assistance, by the "placement services for program

5 completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

6 20 USC §1094(a)(21).

7       396.    Dr. Abazari's right or privilege to a benefit, within a program or activity

8 receiving federal financial assistance, by the "placement services for program

9 completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

10 20 USC §1092(a)(1)(G)(i)-(ii), pursuant to 20 USC §1094(a)(7).

11       397.    Dr. Abazari's right or privilege to a benefit, within a program or activity

12 receiving federal financial assistance, by the "placement services for program

13 completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

14 20 USC §1092(a)(1)(J), pursuant to 20 USC §1094(a)(7).

15       398.    Dr. Abazari's right or privilege to a benefit, within a program or activity

16 receiving federal financial assistance, by the "placement services for program

17 completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

18 20 USC §1092(a)(1)(M), pursuant to 20 USC §1094(a)(7).

19       399.    Dr. Abazari's right or privilege to a benefit, within a program or activity

20 receiving federal financial assistance, by the "placement services for program

21 completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

22 20 USC §1094(a)(1).

23

1    400.   Dr. Abazari's right or privilege to a benefit, within a program or activity

2    receiving federal financial assistance, by the "placement services for program

3    completers," and CIP Code 51.2101, has been expressly secured to him under mandate of

4    20 USC §1094(a)(17).

5    401.   The DOE, Navient and RFUMS believed that there was a high likelihood

6    the DOE, Navient and RFUMS were participating in an enterprise to charge for benefits

7    and services it doesn't provide where Dr. Abazari objects to a "failing to provide

8    placement into residency upon graduation (See. Notice of Intent, Doctor of Podiatric

9    Medicine Program)," where on January 1st 2019, Dr. Abazari notified Ray Hendren,

10   Regional Inspector General for Audit for DOE OIG, Adam Shanedling, DOE OIG

11   Western Regional Office, DOE FSA Ombudsman Group, and Navient, Office of

12   Costumer Advocate, of the express objection that RFUMS guarantees "100% of

13   graduates will be placed in a CPME approved residency program," on at least 6 separate

14   occasions.

15   402.   The "failing to provide placement into residency upon graduation (See.

16   Notice of Intent, Doctor of Podiatric Medicine Program)", where RFUMS expressly

17   admits to providing "100% of graduates will be placed in a CPME approved residency

18   program," constituted a red flag to the DOE, APMA, State of Illinois, Navient and

19   RFUMS regarding the legitimacy of the education transaction, especially where the State,

20   itself, makes the statement:

¶ 4     In 2003, RFUMS applied to the Illinois Board of Higher Education (IBHE) for permission
to operate a program (Scholl College) offering the degree of "Doctor of Podiatric Medicine"
(DPM). In its description of the proposed program, RFUMS included the statement that
"[a]fter graduation Scholl College places its graduates in 24[-] and 36[-]month residency
training programs." The application also stated that Scholl College expected to enroll about 90
students each year, for a total of 360 in the 4-year program. The IBHE approved the application
for the DPM program.

21

1

2   403. The DOE takes steps to avoid the truth, where Dr. Abazari states to Hon.

3 John B. King in express terms "**I am a victim** of Rosalind Franklin's **conversion of**

4 **United States federal loan monies,"** (emphasis supplied), while the DOE completely

5 disregard said response in its May 2, 2016 letter, stating he has "private student loan

6 debt" and therefore "U.S. Department of Education (ED) does not have jurisdiction":



7

1    404.   The "failing to provide placement into residency upon graduation (See.

2   Notice of Intent, Doctor of Podiatric Medicine Program)," where Dr. Abazari responds

3   on May 13, 2016 to the DOE Secretary that "I don't have private loans. In fact, the first

4   few sentences of my letter state in unequivocal terms that 'I am a victim of Rosalind

5   Franklin's conversion of United States federal loan monies for unauthorized criminal

6   conduct 110 ILCS 1010/8" and "you simply disregarded my concerns as though they

7   didn't exist," constituted red flag to the DOE regarding the legitimacy of the education

8   transaction.

<div align="center">May 13-Open Letter</div>

To:
Hon. John B. King, Jr.
Acting Secretary of Education
Lyndon Baines Johnson Department of Education Building
400 Maryland Avenue SW
Washington, DC 20202

***Re: Response To Department of Education Letter and My Grievances***

Mr. King, I am respectfully responding to your mailed packet and approaching you once again with my grievances:

Firstly, I believe you are in error because I did not indicate anywhere on the April 7, 2016 letter that I intended or was seeking to have my "private student loan debt be discharged". I don't have private loans. In fact, the first few sentences of my letter state in unequivocal terms that "I am a victim of Rosalind Franklin's conversion of **United States federal loan monies** for unauthorized criminal conduct under 110 ILCS 1010/8" (emphasis supplied)(See. 4/7/16 Open Letter). I believe if your office was truly concerned and interested in actually stopping the fraud and suffering incurred, both my email address and phone number were listed in the letter as points of further information gathering, rather, you made it easy for yourself and sent out a nonspecific and inapplicable letter; you simply disregarded my concerns as though they didn't exist. In fact, I tried to contact your office by phone on my own initiative but the number you have provided to the public is useless. I tried to call the Office of the Secretary at least four different times on 4/25/16, 4/26/16, 5/5/16, and 5/6/16 and I was led directly to a voice recording with no call back, regardless if a message was left or not.

9

10    405.   The direct change in DOE response from Dr. Abazari having "private

11   student loan debt" on May 2016 to "we regret the difficulties that you are experiencing

with your federal student loan debt" on June 10, 2016, direct after Dr. Abazari expressly confronts DOE Secretary stating "I don't have private loans. In fact, the first few sentences of my letter state in unequivocal terms that 'I am a victim of Rosalind Franklin's conversion of United States federal loan monies for unauthorized criminal conduct 110 ILCS 1010/8" and "you simply disregarded my concerns as though they didn't exist," constituted red flags to the DOE regarding the legitimacy of the education transaction:

JUNE 10, 2016

Mr. Armin Abazari
14 National Place
Irvine, California 92602-0703

Dear Mr. Abazari:

Thank you for your inquiry to Secretary King regarding your concern about the federal student loan debt that you obtained while attending Rosalind Franklin University of Medicine and Science. You are asking for total loan forgiveness for your federal student loan debt because you believe that you were a victim of fraud. You stated that Rosalind Franklin University offered falsified degrees that have no market value.

We understand your concern regarding Rosalind Franklin University of Medicine and Science, and we regret the difficulties that you are experiencing with your federal student loan debt. You stated that your balance that has increased to over $200,000. You explained that the school has a history of federal indictments and civil fraud claims, and you want the school to be held accountable.

The promissory note that a borrower signs before receiving a federal student loan specifies that the borrower is responsible for paying all accrued interest except for interest paid by the federal government for subsidized loans during in-school, grace, and deferment periods. The promissory note is a binding legal document. When a borrower signs it, he or she is agreeing to repay the loan according to the promissory note's terms.

Under the law, you may be eligible for a borrower defense to repayment discharge of the William D. Ford Direct Loans (Direct Loans) that you secured to attend a school if that school committed fraud by doing something or failing to do something, misrepresented its services, or otherwise violated applicable state law related to your loans or the educational services for which you paid. This can apply to you regardless of whether your school closed or you are otherwise eligible for a loan discharge under other applicable laws. The law requires borrowers to submit a claim in order to receive debt relief. Through borrower defense to repayment, you may be able to have your entire outstanding federal Direct Loan forgiven and be reimbursed for amounts you have already paid.

Please note that the U.S. Department of Education (ED) will acknowledge a borrower's claim under state law as a defense to repayment of a loan only if the cause of action directly relates to the loan or to the school's provision of educational services for which the loan was provided. It will not recognize, as a defense against repayment of the loan, borrower claims that are not directly related to the loan or the educational services, such as personal injury tort claims or claims based on allegations of harassment. ED is creating a process to make it as easy as possible for borrowers who attended schools that did not meet legal obligations to seek loan forgiveness (discharge) based on borrower defense to repayment.

More information on borrower defense to repayment, including a borrower defense claim form for borrowers to use, and how to get your loan discharged will be made available at https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense at a later time.

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION
830 First Street, NE, Washington, DC 20202
StudentAid.gov

1      406.    The DOE takes deliberate steps to avoid the truth, where after Defendant

2    DOE was placed on express notice of this fact through the citation of "State Document:

3    NOTICE OF INTENT under Oath" and "Federal Document: IPEDS checked box

4    'Placement Services for Program Completers' 2008-20014", and the DOE still did not

5    discharge Dr. Abazari's loans after 1 year and 7 months later on June 19, 2017, or

6    thereafter:

7

**From:** "U.S. Department of Education" < noreply@studentloans.gov >
**Date:** June 19, 2017 at 11:05:35 AM PDT
**To:** arminabazari@yahoo.com
**Subject: Borrower Defense Claim Status Update**



Dear Armin,

This email is being sent to update you on the current status of your claim for borrower defense to repayment. We are continuing to evaluate your claim but have not yet made a decision if the claim will be approved. Once a decision has been made on your claim, you will be notified of the decision. If it is determined that additional information is needed, we will reach out to request that information from you then.

If you have chosen to have your loans placed on forbearance or stop collection activity while your claim is reviewed, we will continue to notify your servicer to extend that status until your claim has been decided.

Sincerely,

U.S. Department of Education

Connect with us:

  

8

9      407.    The DOE takes steps to avoid the truth, where after Defendant DOE was

10    placed on express notice of this fact through the citation of "State Document: NOTICE

11    OF INTENT under Oath" and "Federal Document [] IPEDS checked box 'Placement

12    Services for Program Completers' 2008-20014," the DOE still has not discharge Dr.

13    Abazari's loans after 3 years and 7 months, or thereafter:

Principal Balance 152,289.08 July 5, 2015; Outstanding Interest $16,160.71
Principal Balance 225,139.23 June 2, 2016; Unpaid Interest $2,540.93
Principal Balance 225,139.23 June 2, 2017; Unpaid Interest $17,524.86
Principal Balance 225,139.23 June 2, 2018; Unpaid Interest $32,554.30
Principal Balance 225,139.23 June 2, 2019; Unpaid Interest $47,694.86.

408. As noted by the screen shot of the Navient Mailbox, Navient took steps to avoid the truth, where after being served on the 1st of January, 2019 with Dr. Abazari Notice of Termination of Contract citing 18 U.S.C. 1584(a)-(b) and 18 U.S.C. §1593 and citing notification to the law enforcement agency Office of Inspector General for the Department of Education, Navient sought to thereafter to interfere with and prevent the enforcement 18 U.S.C. §1581, by withholding and restricting access to records, to curtail or obstruct investigation by Dr. Abazari:

NAVIENT Department of Education Loan Servicing

My Inbox | My Account

**Correspondence Summary**

**Documents We Sent to You** provides access to correspondence that contains non-public, personal information (NPI data) which was recently referenced in an email to you. These documents will be available online at this website for 12 months.

**Documents You Sent to Us** provides access to any correspondence you or your cosigner may have provided to Navient that does not contain non-public, personal information (NPI data) such as a Driver's License or Social Security card for someone other than yourself. You can view these documents online at this website for 7 days.

If you would like to retain a permanent copy of a document, it should be saved to your computer. The documents listed below are in Adobe Reader format. If you wish to view the correspondence and have not already installed Adobe Reader, please install it first. A free copy of Adobe Reader is available for download at http://get.adobe.com/reader/otherversions/. If you have any questions or if you would like us to mail you copies of any of these documents, please contact us at (800) 722-1300.

Documents We Sent to You | Documents You Sent to Us

| DATE | MAIL SUBJECT | CORRESPONDENCE | | | |
|---|---|---|---|---|---|
| 22-Feb-2019 | New document ready to view! | The Customer Advocate Unit received your inquiry | PDF | IMG | |
| 06-Feb-2019 | New document ready to view! | The Customer Advocate Unit received your inquiry | PDF | IMG | |
| 22-Jan-2019 | Change in Loan Terms | Change in Terms Letter | PDF | IMG | |
| 20-Jan-2019 | What you need to know about your repayment | Payment Schedule Options | PDF | IMG | HTML |
| 20-Jan-2019 | Change in Loan Terms | Change in Terms Letter | PDF | IMG | |
| 10-Jan-2019 | New document ready to view! | We?re researching your request | PDF | IMG | |
| 10-Jan-2019 | New document ready to view! | The Customer Advocate Unit received your inquiry | PDF | IMG | |
| 03-Dec-2018 | Your Interest Statement is Available | Your semi-annual interest statement | PDF | IMG | HTML |
| 02-Jun-2018 | Quarterly Interest Statement Available | Your quarterly forbearance statement is available | PDF | IMG | HTML |
| 03-Apr-2018 | Quarterly Interest Statement Available | Quarterly Interest Statement | PDF | IMG | HTML |
| 20-Mar-2018 | New document ready to view! | Administrative Forbearance Processed | PDF | IMG | |
| 03-Mar-2018 | Quarterly Interest Statement Available | Your quarterly forbearance statement is available | PDF | IMG | HTML |

Logout

About SSL Certificates

About Us | Terms of Use | Protecting Your Privacy | Social Media Policies | Contact Us
Accessibility | About Our Ads | Site Map

© 20192019 Navient Solutions, LLC. All rights reserved. Navient and the Navient logo are the service marks of Navient Solutions, LLC.
Navient Corporation and its subsidiaries, including Navient Solutions, LLC, are not sponsored by or agencies of the United States of America.

1    409.    The "failing to provide placement into residency upon graduation (See.

2    Notice of Intent, Doctor of Podiatric Medicine Program)," where Navient sought on or

3    after February 22, 2019 to interfere with and prevent the enforcement 18 U.S.C. §1581,

4    by withholding and restricting access to records from further investigation by Dr.

5    Abazari, as noted by the screen shot of the Navient Mailbox, constituted a red flag to

6    Navient regarding the legitimacy of the education transaction.

7    410.    Navient took steps to avoid the truth, where "[o]n March 19, 2018, we

8    received a request to place your loans in the Borrower Defense to Repayment

9    Forbearance while your claim was reviewed" and still continued charge interest on Dr.

10   Abazari's loans:

11   Principal Balance 152,289.08 July 5, 2015; Outstanding Interest $16,160.71
12   Principal Balance 225,139.23 June 2, 2016; Unpaid Interest $2,540.93
13   Principal Balance 225,139.23 June 2, 2017; Unpaid Interest $17,524.86
14   Principal Balance 225,139.23 June 2, 2018; Unpaid Interest $32,554.30
15   Principal Balance 225,139.23 June 2, 2019; Unpaid Interest $47,694.86.
16
17   411.    The "failing to provide placement into residency upon graduation (See.

18   Notice of Intent, Doctor of Podiatric Medicine Program)," where "[o]n March 19, 2018,

19   we received a request to place your loans in the Borrower Defense to Repayment

20   Forbearance while your claim was reviewed" and while, still continuing to charge interest

21   on Dr. Abazari's loans, constituted a red flag to Navient regarding the legitimacy of the

22   education transaction.

23   412.    RFUMS knew it was highly likely that it was participating in an unlawful

24   agreement with APMA, DOE, State of Illinois, and Navient, to conduct an enterprise

25   through racketeering activity, and RFUMS took steps to avoid the truth, where it

26   knowingly and willingly, in direct violation of said act, RFUMS withheld documentation

1    that was distributed in private meetings with Christine Rasinski, and to which remained

2    in the exclusive possession of RFUMS, which therein sought to procure from Dr.

3    Abazari, through deception, a signed agreement to release RFUMS of liability for non

4    placement of Dr. Abazari into residency upon graduation:

> **From:** "Rasinski, Christine" <Christine.Rasinski@rosalindfranklin.edu>
> **Date:** June 8, 2011 at 8:17:51 AM PDT
> **To:** "Abazari, Armin" <Armin.Abazari@my.rfums.org>, "Abraham, Bijoy" <Bijoy.Abraham@my.rfums.org>, "Alianello, Nicholas"
> <Nicholas.Alianello@my.rfums.org>, "Allanson, Maureen" <Maureen.Allanson@my.rfums.org>, "Amidi, Arezou"
> <Arezou.Amidi@my.rfums.org>, "Andress, William" <William.Andress@my.rfums.org>, "Arens, David" <David.Arens@my.rfums.org>,
> "Arroyo, Irene" <Irene.Arroyo@my.rfums.org>, "Baptist, Christopher" <Christopher.Baptist@my.rfums.org>, "Barnica, Elizabeth"
> <Elizabeth.Barnica@my.rfums.org>, "Bawa, Vaishnavi" <Vaishnavi.Bawa@my.rfums.org>, "Bernstein, Jennifer"
> <Jennifer.Bernstein@my.rfums.org>, "Budzinski, Michael" <Michael.Budzinski@my.rfums.org>, "Budz, Tomasz"
> <Tomasz.Budz@my.rfums.org>
> **Cc:** "Yorath, Martin Charles" <Martin.Yorath@rosalindfranklin.edu>, "Jarrett, Beth D." <Beth.Jarrett@rosalindfranklin.edu>
> **Subject: Clerkship Office Paperwork**
>
>
> Please report to the Clerkship Office Scholl College - HSB Room L616 today **BEFORE** 2:15pm or tomorrow, Thursday,
> between 8:00am and Noon to pick up your clerkship informational folder and to sign off on paperwork, this should take you
> no more than 5 minutes. You must present in person, no one can sign for you.
>
> Christine Rasinski
> Coordinator
> Clerkship & Residency Placement Office
> Scholl College of Podiatric Medicine
> 847-578-8408 - Office
> 847-775-6520 - Fax

5    _____

6    413.   The "failing to provide placement into residency upon graduation (See.

7    Notice of Intent, Doctor of Podiatric Medicine Program)," where on January 1st 2019,

8    Dr. Abazari served a notice of termination of contract directly to Navient, and Navient

9    still continued charge interest on Dr. Abazari's loans, constituted a red flag to Navient

10   regarding the legitimacy of the education transaction.

11   414.   Navient took steps to avoid the truth, where on the 21st of January 2019,

12   Dr. Abazari served another notification of his objections to Navient, and Navient still

13   continued to charge interest on Dr. Abazari's loans:

14   Principal Balance 152,289.08 July 5, 2015; Outstanding Interest $16,160.71
15   Principal Balance 225,139.23 June 2, 2016; Unpaid Interest $2,540.93
16   Principal Balance 225,139.23 June 2, 2017; Unpaid Interest $17,524.86
17   Principal Balance 225,139.23 June 2, 2018; Unpaid Interest $32,554.30
18   Principal Balance 225,139.23 June 2, 2019; Unpaid Interest $47,694.86.
19

415.    The "failing to provide placement into residency upon graduation (See.

Notice of Intent, Doctor of Podiatric Medicine Program)," where on the 21st of January

2019, Dr. Abazari served another notification of his objections to Navient, and Navient

still continued to charge interest on Dr. Abazari's loans, constituted a red flag to Navient

regarding the legitimacy of the education transaction.

416.    Navient took steps to avoid the truth, where on the 4th of February 2019,

Dr. Abazari served another notification of his objections to Navient, and Navient still

continued to charge interest on Dr. Abazari's loans:

Principal Balance 152,289.08 July 5, 2015; Outstanding Interest $16,160.71
Principal Balance 225,139.23 June 2, 2016; Unpaid Interest $2,540.93
Principal Balance 225,139.23 June 2, 2017; Unpaid Interest $17,524.86
Principal Balance 225,139.23 June 2, 2018; Unpaid Interest $32,554.30
Principal Balance 225,139.23 June 2, 2019; Unpaid Interest $47,694.86.

417.    The "failing to provide placement into residency upon graduation (See.

Notice of Intent, Doctor of Podiatric Medicine Program)," where on the 4th of February

2019, Dr. Abazari served another notification of his objections to Navient, and Navient

still continued to charge interest on Dr. Abazari's loans, constituted a red flag to Navient

regarding the legitimacy of the education transaction.

418.    Navient took steps to avoid the truth, where on the 19th of February 2019,

Dr. Abazari served another notification of his objections to Navient, and Navient still

continued to charge interest on Dr. Abazari's loans:

Principal Balance 152,289.08 July 5, 2015; Outstanding Interest $16,160.71
Principal Balance 225,139.23 June 2, 2016; Unpaid Interest $2,540.93
Principal Balance 225,139.23 June 2, 2017; Unpaid Interest $17,524.86
Principal Balance 225,139.23 June 2, 2018; Unpaid Interest $32,554.30
Principal Balance 225,139.23 June 2, 2019; Unpaid Interest $47,694.86.

419.    The "failing to provide placement into residency upon graduation (See.
Notice of Intent, Doctor of Podiatric Medicine Program)," where on the 19th of February
2019, Dr. Abazari served another notification of his objections to Navient, and Navient
still continued to charge interest on Dr. Abazari's loans, constituted a red flag to Navient
regarding the legitimacy of the education transaction.

420.    Navient took steps to avoid the truth, where on 8th of March 2019, Dr.
Abazari served another notification of his objections to Navient, and Navient still
continued to charge interest on Dr. Abazari's loans:

Principal Balance 152,289.08 July 5, 2015; Outstanding Interest $16,160.71
Principal Balance 225,139.23 June 2, 2016; Unpaid Interest $2,540.93
Principal Balance 225,139.23 June 2, 2017; Unpaid Interest $17,524.86
Principal Balance 225,139.23 June 2, 2018; Unpaid Interest $32,554.30
Principal Balance 225,139.23 June 2, 2019; Unpaid Interest $47,694.86

421.    The "failing to provide placement into residency upon graduation (See.
Notice of Intent, Doctor of Podiatric Medicine Program)," where on 8th of March 2019,
Dr. Abazari served another notification of his objections to Navient, and Navient still
continued to charge interest on Dr. Abazari's loans, constituted a red flag to Navient
regarding the legitimacy of the education transaction.

422.    APMA believed that it was highly likely that it was participating in an
unlawful agreement with DOE, Navient, RFUMS, and State of Illinois to conduct an
enterprise through racketeering activity, where the APMA admits that "[t]here are
currently enough slots for students who are graduating for schools of podiatric medicine"
in response to a question regarding an issue of "availability of podiatric residencies":

**Q. Is the availability of podiatric residencies an issue?**
**A.** There are currently enough slots for students who are graduating from schools of podiatric medicine. There are fewer applicants to the colleges, which may be reflected later on. Surpluses in residency positions may exist in the future as fewer students attend the colleges. (See "In the News," p. 14).

1    423.    In the clear and "expected shortfall" in "number of available residency

2    positions," APMA took steps to avoid the truth, where in "a blog by APMA Executive

3    Director and CEO Glenn B. Gastwirth, DPM", Defendant APMA responds to "not

4    accepting more students than residency slots...for the immediate crises" with "[t]his sort

5    of constructive thinking is what we need most in a challenging situation such as this":



6

7    424.    Where the APME was involved with the creation of an Ad Hoc

8    Committee" in 2004 because they "expected shortfall" in "number of available residency

9    positions," where the APMA responds to "not accepting more students than residency

10   slots...for the immediate crises" with the statement "[t]his sort of constructive thinking is

11   what we need most in a challenging situation such as this," constituted a red flag to the

12   APMA regarding the legitimacy of the education transaction.

13   425.    APMA knowingly and willingly participated in an unlawful agreement

14   with DOE, Navient, RFUMS, and State of Illinois, to conduct an enterprise through

15   racketeering activity, where it took conscious steps to remove "a blog by APMA

16   Executive Director and CEO Glenn B. Gastwirth, DPM", after Dr. Abazari and 86 others

17   were not placed into residency, to destroy evidence that on May 22, 2011, Ron Barron

195

1    placed the APMA on notice of "criminal" activity in "pocket millions of dollars from

2    students, without knowing that each of them will be able to receive a residency upon

3    graduation":

> "The AACPM site shows the class of 2014 is actually larger by 41
> than the class of 2013. I have never heard a reasonable explanation
> as to why the colleges are matriculating more students than ever!!
> It is nothing less than criminal to pocket millions of dollars from
> students, without knowing that each of them will be able to receive
> a residency upon graduating."

11       426.    Where the APMA was involved with the creation of an Ad Hoc

12   Committee" in 2004 because they "expected [a] shortfall" in "number of available

13   residency positions," Ron Barron statement to the APMA that "I have never heard a

14   reasonable explanation as to why the colleges are matriculating more students than ever!!

15   It is nothing less than criminal to pocket millions of dollars from students, without

16   knowing that each of them will be able to receive a residency upon graduating,"

17   constituted a red flag, and the deletion of said blog constitutes a red flag, to the APMA,

18   RFUMS, DOE, Navient, and State of Illinois regarding the legitimacy of the education

19   transaction.

20       427.    APMA took steps to avoid the truth, where in "a blog by APMA

21   Executive Director and CEO Glenn B. Gastwirth, DPM", Defendant APMA tries to lull

22   students into a false sense of security where December 20, 2010, APMA states

> "APMA recognizes the potential severity of this situation in the
> short term, although we are uncertain that there would be residency
> position shortages for 2013 graduates....As I'm sure you are aware,
> the council has frozen class sizes at all the accredited colleges of
> podiatric medicine."

29       428.    In the clear and present fact the APMA was involved with the creation of

30   an Ad Hoc Committee" in 2004 because they "expected shortfall" in "number of

1    available residency positions," the APMA's statement "APMA recognizes the potential

2    severity of this situation in the short term, although we are uncertain that there would be

3    residency position shortages for 2013 graduates....As I'm sure you are aware, the council

4    has frozen class sizes at all the accredited colleges of podiatric medicine," constituted a

5    red flag to the APMA regarding the legitimacy of the education transaction.

6         429.    APMA acted with intent to act out an enterprise, in association with the

7    DOE, Navient, RFUMS, and State of Illinois, that conducts its affairs through a pattern of

8    racketeering activity, where unplaced podiatric graduate from KSCPM, published in the

9    PM news stating on 7/31/2013, states:

10         "A classmate of mine commented on a blog of the
11         APMA's Dr. Gastwirth in 2011 – voicing concerns
12         about a residency shortage and the disconnect
13         between the colleges, the APMA and the CPME
14         concerning the large numbers of students
15         matriculating. My colleague expressed fears of
16         there being as many as 100 too few residency spots
17         by 2013 (incredibly prophetic as time would show),
18         to which Dr. Gastwirth replied that it was unknown
19         whether there would be any shortage of residency
20         spots for the class of 2013. This thread has since
21         been removed from the APMA website."
22
23         430.    In the clear and present fact the APMA was involved with the creation of

24    an Ad Hoc Committee" in 2004 because they "expected shortfall" in "number of

25    available residency positions," the public statement "Dr. Gastwirth replied that it was

26    unknown whether there would be any shortage of residency spots for the class of 2013.

27    This thread has since been removed from the APMA website," and the actual destruction

28    of the evidence of wire transmission of the "blog by APMA Executive Director and CEO

29    Glenn B. Gastwirth, DPM" referenced by the witness, constituted a red flag to the

1   APMA, DOE, RFUMS, Navient, and Stae of Illinois regarding the legitimacy of the

2   transaction.

3       431.   APMA, RFUMS, DOE, Navient, State of Illinois, took steps to avoid the

4   truth, where for Dr. Abazari's time of enrollment in 2009, Podiatry colleges enrolled 687

5   students into the podiatry colleges, when only 496 residency positions were available or

6   in existence.

7       432.   The APMA and RFUMS, acted with intent to conduct an enterprise which

8   conducted its affairs through a pattern of racketeering activity by creating and adopting a

9   new residency system which required "fewer case number requirements in the new model

10   as opposed to the old model," to generate more residency positions, at the expense of the

11   public, to conceal the actual number of graduates unplaced by the expected shortfall:

**Beth Jarrett**   September 24, 2012  8:35 AM
To: d-scpm2014@rosalindfranklin.edu,   d-scpm2013@rosalindfranklin.edu   Details
PMS vs PMSR programs

Hello all-
I am still getting some questions about the residency types.  Remember that the "PMS" model (PMS24 or PMS36) is the old model.  The PMSR (PMSR or PMSR/RRA) is the new model.  All programs will have converted to the new model by July 1, 2013.  Most PMS24 programs will convert to PMSR programs.  Nearly all PMS36 programs will convert to the PMSR/RRA (or PMSR with CERT) programs.  The only difference between a PMS 36 and a PMSR with RRA is a change in the medicine and biomechanics requirements, as well as slightly **fewer** case number requirements in the new model as opposed to the old model.
Let me know if you have any questions.
Dr. Jarrett

12

13       433.   In the clear and present fact the APMA and RFUMS created an Ad Hoc

14   Committee" in 2004 because of an "expected shortfall" in "number of available residency

15   positions," the enrollment at Dr. Abazari's time of enrollment in 2009, of 687 students

16   into the podiatry colleges, when only 496 residency positions were available or in

17   existence, constituted a red flag to the DOE, Navient, RFUMS, APMA, and State of

18   Illinois, regarding the legitimacy of the transaction.

198

1        434.    RFUMS took steps to avoid the truth, where at least seventeen students

2   and Dr. Abazari from Defendant RFUMS institution were actually victimized by

3   Defendant RFUMS failure to provide placement, despite having paid full tuition:

> **From:** Nancy Bryant <nancy.bryant@rosalindfranklin.edu>
> **Date:** March 26, 2013 at 8:15:19 AM PDT
> **To:** "Abazari, Armin" <armin.abazari@my.rfums.org>, "Campbell, Thomas3"
> <thomas.campbell@my.rfums.org>, "Castelein, Bryant" <bryant.castelein@my.rfums.org>,
> "Ciotola, Nicholas" <Nicholas.Ciotola@my.rfums.org>, "Delara, Marc3"
> <marc.delara@my.rfums.org>, "Deutsch, Gloria3" <gloria.deutsch@my.rfums.org>, "Domaas,
> Mark3" <mark.domaas@my.rfums.org>, "Hall, Samuel3" <samuel.hall@my.rfums.org>, "Hare,
> Daniel" <daniel.hare@my.rfums.org>, "Hussain, Syed3" <syed3.hussain@my.rfums.org>,
> "Kapila, Tania" <tania.kapila@my.rfums.org>, "Kramer, Nathan3"
> <nathan.kramer@my.rfums.org>, "Landers, Sabrina" <sabrina.landers@my.rfums.org>,
> "Luczkowski, Ernest Paul" <ernest.luczkowski@my.rfums.org>, "Musser, Bret3"
> <bret.musser@my.rfums.org>, "Richason, Jessica3" <jessica.richason@my.rfums.org>,
> "Schroeder, Christopher" <c.schroeder@my.rfums.org>, "Valabov, Jacob"
> <jacob.valabov@my.rfums.org>
> **Subject: Updated Preceptorship Information**
>
> Hello,
>
> Just a fyi...
>
> AAPPM updated their preceptorship info (attached).
>
> Also, Weil Foot & Ankle is accepting preceptor applications. If you are interested contact Harriet
> Kass hkass@weil4feet.com or 847.627.4962.

4

5        435.    APMA and RFUMS took steps to avoid the truth, where Dr. Usman

6   Akram and at least ten of Defendant RFUMS's that were unplaced, sought legal counsel

7   against Defendant RFUMS conduct:

On Fri, Jun 28, 2013 at 12:11 PM, Usman Akram <utakram@gmail.com> wrote:
Hello again,

I communicated with Dr. Kansky recently.  He was meeting with two lawyers this week regarding the residency issue.

He also reported that ten people had contacted him from Scholl.

I urge the rest of you to contact him as well.

His email is: larry.kansky@gmail.com


Thanks and have a great weekend,

Usman Akram, DPM

Confidentiality Notice: DO NOT read, copy or disseminate this communication unless you are the intended addressee. This e-mail communication (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C Sections 2510-2521, contains confidential and/or privileged information intended only for the addressee. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately via email to that you have received the communication in error. Please, delete it and any and all copies.

1

2        436.    APMA and RFUMS took steps to avoid the truth, where RFUMS resorted

3    to luring students into filling out accreditation surveys for the podiatry program, in

4    exchange for a chance to win an iPAD Mini, because of a "low return rate from your

5    class on the survey this year—so low that the data was unreliable":

From: Nancy Parsley <nancy.parsley@rosalindfranklin.edu>
Date: Fri, Sep 13, 2013 at 1:36 PM
Subject: Survey Request & Raffle Prize for Completion
To: Nancy Parsley <nancy.parsley@rosalindfranklin.edu>
Cc: John Becker <john.becker@rosalindfranklin.edu>, Daniel Barether <daniel.barether@rosalindfranklin.edu>, Patty Cunningham
<patricia.cunningham@rosalindfranklin.edu>, Beth Jarrett <beth.jarrett@rosalindfranklin.edu>, Nancy Bryant <nancy.bryant@rosalindfranklin.edu>,
Kara Etolen <kara.etolen@rosalindfranklin.edu>

Dear Doctors and Graduates of the SCPM class of 2013,
I hope all is going well for you, and that the College has prepared you for your post-graduate activities.  We need to ask a special favor of you.  The
College is up for accreditation this year, and it is important that SCPM has enough data to support the curriculum.  We rely a lot on the curriculum
surveys, especially those filled out by those who have gone through the entire program – namely, you, our graduates.  We had a low return rate from
your class on the survey this year – so low that the data was unreliable.  So we are asking you if you would fill out the survey to help your alma mater
assess the curriculum (it's only 26 questions).
As an incentive, I am offering a raffle ticket for those who return the survey, for one prize (an iPad Mini).  We cannot use D2L, so we are using Survey
Monkey.
The link to the survey is: https://www.surveymonkey.com/s/J8RC5JQ
If you wish to remain anonymous, do not answer the last question with your name.  If you want to enter the raffle, we will need your name to award the
prize.  However, I assure you that that the only person who will know names is the Administrative Assistant handling the survey (Ms. Patty
Cunningham), and she is sworn to secrecy.  Please do not be afraid to criticize the curriculum (no curriculum is perfect) and we welcome positive
feedback as well to know what is working from the students' perspective.  We really do read the surveys (after Patty has removed the names), and we
do try to make practical changes that will help future students.
If you already completed the survey prior to graduation, thank you.  Unfortunately, we do not have a way to transfer those responses to Survey Monkey,
so we are asking you to complete it again.  This will also allow us to include you in the raffle for the iPad Mini if you provide your name.
Thanks, and please let us know about your successes in your current program.
Sincerely and with appreciation,
Dr. Parsley

--
Nancy L. Parsley, DPM, MHPE
Dean
Dr. William M. Scholl College of Podiatric Medicine
Rosalind Franklin University of Medicine and Science
3333 Green Bay Road
North Chicago, IL 60064
Office: 847-578-8401
Fax:  847-775-6516
nancy.parsley@rosalindfranklin.edu

Explore a Career in Podiatric Medicine

6